# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **No. 1:16-cr-00240-01** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **DEREK PELKER,** | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the Court is Defendant Derek Pelker ("Defendant")'s "post-trial motions" (Doc. No. 463) raising seven (7) grounds on which Defendant asserts he is entitled to a new trial in the above-captioned action, which the Court construes as a motion for a new trial. For the reasons stated herein, the Court will deny Defendant's motion.

## I.     BACKGROUND

On May 18, 2018, a jury found Defendant guilty of offenses related to various armed bank robberies (Doc. Nos. 369, 370, 381), as charged in a second superseding indictment dated November 29, 2017 (Doc. No. 203), including: conspiracy to commit armed bank robbery; use of a firearm in relation to a crime of violence; and possession of a firearm by a previously convicted felon. After receiving several extensions of time to do so, Defendant filed the instant motion on January 7, 2019 (Doc. No. 463), to which the Government filed a response on January 22, 2019 (Doc. No. 468). Because the time period for Defendant to file any reply has expired, Defendant's motion is fully briefed and, therefore, ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 33 authorizes post-trial relief in the form of a motion for a new trial. See Fed. R. Crim. P. 33. In pertinent part, Rule 33 provides that "[u]pon the defendant's motion, the [C]ourt may vacate any judgment and grant a new trial if the interest of

justice so requires." See id. "[T]he decision whether to grant a new trial . . . rests in the district court's discretion." United States v. Noel, 905 F.3d 258, 270 (3d Cir. 2018) (citing McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984)). "The [d]istrict [c]ourt may grant a new trial 'if the interest of justice so requires,' and will do so 'only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted.'" United States v. Catarro, 746 F. App'x 110, 115 (3d Cir. 2018) (citing Fed. R. Crim. P. 33(a); United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002)). "A court should only grant a motion for new trial based on errors at trial where the 'error . . . had a substantial influence on the verdict.'" United States v. Norris, 753 F. Supp. 2d 492, 517 (3d Cir. 2010) (quoting United States v. Malik, No. 08-614, 2009 WL 4641706, at *3 (E.D. Pa. Dec. 7, 2009)). "A court may grant a motion for a new trial if it finds errors occurred during the trial and these errors 'when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" United States v. MacInnes, 23 F. Supp. 3d 536, 542 (E.D. Pa. 2014) (quoting United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993)). "Harmless errors that do not deprive a defendant of a fair trial provide no basis for granting a defendant's Rule 33 motion." (Id.) (citing Thornton, 1 F.3d at 156. "Motions for a new trial are disfavored and 'only granted with great caution and at the discretion of the trial court.'" Id. (quoting United States v. Martinez, 69 F. App'x 513, 516 (3d Cir. 2003)).

## III. DISCUSSION

Defendant argues that he is entitled to a new trial based on the following seven (7) contentions: (1) the Court abused its discretion when it denied his request for a continuance of trial; (2) "the Court committed a reversible error by refusing to impeach Ryan Miller"; (3) "Ryan Miller's plea agreement contained information on bad acts against [] Defendant"; (4) his

conditions of confinement at the Dauphin County Prison during the course of his trial

proceedings violated his due process rights; (5) counsel for the Government committed

prosecutorial misconduct by making certain statements during the rebuttal phase of its closing

argument at trial; (6) certain witnesses for the Government "exposed prejudicial evidence against

Defendant"; and (7) "the Court committed a reversible error" when it admitted certain evidence

of a prison phone call involving Defendant at trial. (Doc. No. 463 at 2, 6, 7, 9, 11, 13, 15.) The

Court examines each asserted basis for relief in turn.

### A.      The Court's Denial of Defendant's Request for a Continuance of Trial

Defendant asserts that he is entitled to a new trial because "the Court abused its discretion

when it denied his request for a continuance of a trial prior to [the trial] commencing." (Id. at 2.)

Defendant refers to the Court's denial of his request for a continuance on the morning of his first

day of trial immediately prior to the beginning of jury selection. The relevant portion of the trial

transcript reads as follows:

> THE COURT: Okay. Go ahead, do you have a question?
>
> MR. PELKER: Yes, Your Honor. I actually have some preliminary matters I
> would like to discuss with the court before we start the jury selection. One, I
> would like to state a request for a continuance of this trial on the basis that due to
> me being incarcerated in Dauphin County, I have endured some setbacks in the
> defense, naturally, being there. I just recently obtained a pencil in Dauphin
> County Prison. That was as of Wednesday, I believe.
>
> THE COURT: I'm sorry, you obtained a what?
>
> MR. PELKER: A pencil, a writing utensil to finally start writing stuff down.
> Also, the law library was only being provided on Wednesday, Thursday, Friday,
> and Saturday for an hour, approximately.
>
> Also, no fault of Mr. Abom, there is an abundant amount of discovery still
> needing to be reviewed and discovery that was already reviewed that needs to be
> reviewed a second time because there are extensive interviews with these co-
> defendants and cooperating witnesses.

It just – me and Mr. Abom have not had enough time to mark our exhibits and – to mark my exhibits and to properly review this to present an adequate defense. And I believe that in the current course, it may impede upon my right to a fair trial in this regard.

Also, given that, the housing at DCP will affect me during this trial. DCP feeds breakfast at approximately 3:30 in the morning. I will be getting woken up for 6:30 to be prepared for this court. There will be no time during the night that I would be able to obtain a six-hour uninterrupted sleep. That means I will be coming to this trial with sleep deprivation, while the government enjoys the benefit of sleeping a full night's rest to come to trial fully prepared.

. . .

THE COURT: All right. Mr. Abom.

MR. ABOM: Yes, Your Honor.

THE COURT: I know that you've spent a good deal of time assisting Mr. Pelker in preparation for trial. Do you have a sense of his ability to go forward?

MR. ABOM: Well, Your Honor, I spent Wednesday, Thursday, Friday, and Saturday with him for large amounts of time at the Dauphin County Prison. I've had with me the discovery that had previously been provided to him. In addition, there are, I think, some videos that he could not have while in prison, so we spent time together watching them, listening to them. Mr. Pelker has been logging them. I have done my best to print out certain documents he did not have access to. One of them was a 2,000-page phone extraction report. He now has a copy of that. So in answer to the question, I don't know what specifically Mr. Pelker needs more time to review in general. I mean, I'm not – I don't want to be in conflict with him.

THE COURT: Right.

MR. ABOM: But perhaps he could articulate those items for which he needs more time. I was available. I left on Saturday after spending about three or four hours Saturday. It seemed like we were at a conclusion, and maybe Mr. Pelker didn't think at the time to ask me to come back because he wanted a few more things to review. I don't know.

THE COURT: Okay. Mr. Pelker, you filed a number of motions with the court, and I thought – a number of motions you filed specific requests for voir dire, you filed requests for jury instructions. I reviewed your materials, and I thought they were exceptionally well done for someone in your circumstances who doesn't

have legal training and a full opportunity for some of the advantages that a lawyer might have in your case.

Obviously a motion to continue could have been filed prior to today, and this is really untimely in the worst way. We have 40 jurors waiting to come up and participate in jury selection in your case. Does the government wish to be heard?

MR. FORD: We do, Your Honor. Your Honor, the government would like to point out that initial discovery in this case was provided to the defendant's first attorney, Dan Myshin, on September 16th, 2016. As the court is well aware, the defendant then had a second attorney, Mr. Jeff Conrad, and on January 10th, 2017, all of those same materials were also provided to Mr. Conrad. We were prepared to go to trial last year. I believe the trial date was on May 9th. And prior to that May 9th date – that was a Tuesday – that Friday, the government had given all Giglio and Jencks materials to Mr. Conrad. All of that information was provided. The defendant had it, had access to it through his attorney, and we were prepared to go to trial this time last year. Now, there have been two superseding indictments that have added two additional bank robberies. Having said that, Your Honor, the witness list from today versus the witness list from last year, I believe there's a total of four bank employees that were added and one cooperator. So the defendant had access to all of that material through his attorneys for almost two years now.

Additionally, the defendant, at his own request, was released to the state so he could begin serving his state time and was being housed at SCI Mercer up until last Friday. So he had full – and throughout that time the government heard no complaints about access to a law library or the materials. So the defendant had all of that and he had access to that law library right up until last Friday, whenever we had our motions hearing. Based on all of that, Your Honor, the government sees absolutely no basis for a continuance at this time.

THE COURT: All right. Mr. Pelker, I am going to deny your motion. Do counsel have the jury questionnaires?

(Doc. No. 400 at 4:7-25, 5-7, 8:1-17.)[1] Accordingly, the Court examines whether its denial of

Defendant's request for a continuance warrants a new trial for Defendant.

---

[1] When citing the transcript of the trial proceedings (Doc. Nos. 400-404), the Court refers to the page numbers listed on the transcript itself, rather than the ECF page number, in the event the page numbering differs.

## 1.     Applicable Legal Standard

The Sixth Amendment to the United States Constitution provides, in relevant part, that a criminal defendant has a right "to have the assistance of counsel for his defense." See U.S. CONST. amend. VI. "Due process demands that a defendant be afforded an opportunity to obtain the assistance of counsel of his choice to prepare and carry out a defense." United States v. Kikumura, 947 F.2d 72, 78 (3d Cir. 1991).[2] When a defendant's Sixth Amendment rights appear to conflict "with a trial judge's discretionary power to deny a continuance," courts employ "a balancing test to determine if the trial judge acted fairly and reasonably." See id. (citing United States v. Leavitt, 608 F.2d 1290, 1293 (9th Cir. 1979)). "A trial court's decision to deny a continuance will only be reversed if an abuse of discretion is shown." Id. (collecting pertinent case law). To obtain a new trial based on a court's denial of a continuance, a defendant "must show that despite the discretion given to trial judges to make such decisions, the [C]ourt's denial of the request for a continuance at trial was so erroneous to have produced a miscarriage of justice." See United States v. Cephas, No. 08-cr-163-01, 2009 WL 1587587, at *8 (E.D. Pa. June 4, 2009).

"While a 'myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality,' the Supreme Court has stated that denying a request for a continuance constitutes an abuse of discretion only when it is 'so arbitrary as to violate due process.'" Kikumura, 947 F.2d at 78 (quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964)). "In determining if a continuance should be granted, a court should consider: the efficient administration of criminal justice; the accused's rights, including an

---

[2] In this case, Defendant represented himself at trial with the assistance of his standby counsel, Attorney Abom ("Attorney Abom").

adequate opportunity to prepare a defense; and the rights of other defendants awaiting trial who

maybe prejudiced by a continuance." Id. (citing United States v. Fischbach & Moore, Inc., 750

F.2d 1183, 1995 (3d Cir. 1984)). "A court must weigh all the facts of a particular case when

applying this balancing test." United States v. Diaz, No. 92-cr-78, 1993 WL 85764, at *3 (E.D.

Pa. Mar. 25, 1993) (citing Kikumura, 947 F.2d at 78).

### 2.    Arguments of the Parties

Defendant argues that the Court's denial of his request for a continuance was improper

because he expressed to the Court his issues pertaining to his conditions of confinement at the

Dauphin County Prison and need for additional time to review discovery materials (Doc. No. 463

at 2-4), and that his "failure to file a motion to continue trial was based on the fact that he [was

not] provided any writing utensil, paper, [and/or] envelopes" by the prison facility where he was

housed at the time of trial (id. at 4). Defendant states that, therefore, the Court's denial of his

requests constitutes an abuse of discretion that rendered him unable "to review all discovery

material in this matter and discovery exculpatory evidence [and] impeachment evidence, and

permit him to create an adequate defense." (Id. at 5.) To that end, Defendant argues that, had

the Court ordered that trial be continued, he would have "been able to present an adequate

defense and [be] found not guilty." (Id.)

In response, the Government asserts that Defendant's arguments regarding his inability to

review certain material and prepare for trial are meritless because "[t]hroughout the pendency of

this case, the [G]overnment fulfilled its discovery obligations as soon as practicable and in a

manner to ensure [] [D]efendant would have enough time to prepare for trial." (Doc. No. 468 at

7.) In support of this point, the Government describes the instances on which it provided

Defendant's prior attorneys in this case with discovery material (id.), as well as its subsequent

production of discovery materials to Attorney Abom in January of 2018 and to Defendant at his initial appearance on the second superseding indictment, where the Government provided Defendant "with all of the written discovery materials contained on the electronic storage device, to include the items previously provided to Mr. Conrad" (id. at 8).[3]  Further, the Government rejects Defendant's argument "that he had only 10.4 hours with Mr. Abom to review '21 hours and 34 minutes' of audio and video records" on the basis that the Government provided numerous such recordings to Defendant in January of 2018 (id. at 8), and Defendant's previous attorneys "had access to most of this material and the ability to share it with [him] prior to his first scheduled trial in May of 2017" (id. at 9).[4]  Additionally, the Government cites Attorney Abom's statement at the beginning of trial that he previously reviewed discovery material with Defendant, the fact that Defendant had not previously filed a written motion to continue trial prior to making his request in court on the morning trial was set to begin, and the fact that Defendant "even appeared before the Court on May 4, 2018 for an evidentiary hearing and could have brought his concerns to the Court's attention at that time."  (Id. at 9-10.)  According to the Government, therefore, Defendant is not entitled to a new trial as a result of the Court's denial of his request for a continuance.

### 3.    Whether the Court's Denial of a Continuance Warrants a New Trial

The Court is unpersuaded that, when judged against the standard articulated above, it abused its discretion in denying Defendant's request for a continuance made immediately prior to jury selection.  As an initial matter, it bears noting that while Defendant asserts that he made

---

[3] Here, the Government refers to one of Defendant's previous attorneys in this action.

[4] The Government also states that Defendant "was provided with a full list of discovery materials on January 3, 2018 and had the ability to ask Mr. Abom or his staff to review those items prior to trial and report back to him."  (Doc. No. 468 at 9.)

the reasons warranting a continuance known to the Court well before the May 2018 trial date in the form of various letters (Doc. Nos. 463-3, 463-4, 463-5, 463-6, 463-7), the essence of Defendant's assertions in those writings is his general dissatisfaction with the following: his previous court-appointed counsel, which was ostensibly remedied upon the appointment of Attorney Abom as standby counsel; his need for certain discovery materials, which, as reflected by the trial record and noted in the Government's response, were provided to Defendant well in advance of the scheduled trial; and the quality of the conditions of his confinement at the Dauphin County Prison, which the Court finds to be an insufficient justification for a continuance of the sort requested by Defendant. Additionally, it is noteworthy that Defendant had ample opportunity to request a continuance in writing, either on his own or through his standby counsel, or in person before this Court at the May 4, 2018 evidentiary hearing pertaining to his pretrial motions. The record, therefore, demonstrates that this Court was well within its discretion to deny Defendant's eleventh-hour request for a continuance. See, e.g., United States v. Glenn, No. 15-cr-199-1, 2018 WL 4091788, at *12-13 (E.D. Pa. Aug. 24, 2018) (concluding that the denial of a request for continuance made three days prior to the start of trial was not an abuse of discretion "in view of the length of time and amount of resources given to" the defendant); United States v. Cephas, No. 08-cr-163-01, 2009 WL 1587587, at *8 (E.D. Pa. June 4, 2009) (finding that the denial of a defendant's request for a continuance during trial to allow for the defendant to attempt to locate a witness was not an abuse of discretion because the court "appropriately balanced the interest of judicial efficiency with the right of the defendant to a fair trial"); see also McNeil v. United States, Nos. 3:12-cv-362, 3:09-cr-320, 2012 WL 3260419, at *11-12 (M.D. Pa. Aug. 8, 2012) (describing Third Circuit case law in which courts have acted within their discretion to deny requests for continuances made at the eleventh hour and rejecting

the petitioner's "assert[ion] that the court somehow violated his Sixth Amendment and due process rights by rejecting his last minute request to fire his able court-appointed attorney and hire a new attorney of his choosing").  Accordingly, Defendant is not entitled to a new trial on this ground.

**B.      Impeachment of Ryan Miller as a Witness**

Next, Defendant asserts that during trial, "the Court committed a reversible error by refusing to impeach Ryan Miller," ("Miller") a witness for the Government, on the basis that the Court did not permit Defendant "to expose [] Miller's bias toward[] him during cross examination" pertaining to Miller's alleged views regarding race vis-à-vis Defendant and did not allow Defendant to explain fully "why this information was proper impeachment evidence." (Doc. No. 463 at 6.)  Defendant's cross-examination of Miller proceeded, in pertinent part, as follows:

Q. And were you and the defendant at all – did you and the defendant hold different beliefs in certain things?

A. Yes.

Q. Can you elaborate on that?

A. I'm not sure I understand the question.

Q. Did you hold any radical beliefs in life?

MR. FORD: Objection, Your Honor.  Improper impeachment.

THE COURT: Sustained, sustained.

BY MR. PELKER: Q. Mr. Miller, were you a part or affiliated with any group?

MR. FORD: Objection, Your Honor.  Improper impeachment evidence.

THE COURT: This is not proper.

MR. PELKER: Your Honor, this is for motive and bias.

10

THE COURT: Not proper, not proper.

(Doc. No. 400 at 217:18-25, 218:1-8.)

Defendant states both that the Court committed a reversible error and that the above exchange entitles him to a new trial.[5] Accordingly, the Court examines whether it erred in limiting the scope of Defendant's cross-examination of Miller and whether Defendant is entitled to a new trial on this basis.

### 1.    Applicable Legal Standard

"Limitations that a district court places on cross-examination are reviewed for abuse of discretion." United States v. Mussare, 405 F.3d 161, 169 (3d Cir. 2005) (citing United States v. Chandler, 326 F.3d 210, 213 (3d Cir. 2003)). "The Confrontation Clause guarantees a criminal defendant the right to 'be confronted with the witnesses against him.'" United States v. Noel, 905 F.3d 258, 267 (3d Cir. 2018) (quoting U.S. CONST. amend. VI.). "Primary among those rights is 'the right of cross-examination,' which may include questions 'directed toward revealing possible biases, prejudices, or ulterior motives of the witness.'" Id. at 267 (quoting Davis v. Alaska, 415 U.S. 308, 315-16 (1974)). "Despite this guarantee, trial judges retain 'wide latitude . . . to impose reasonable limits on . . . cross examination,' which a defendant may overcome by showing that, had the proposed line of inquiry been permitted, the jury 'might have received a significantly difference impression of [the witness's] credibility.'" Id. at 267-68 (alterations in original) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679-80 (1986)); see also Chandler, 326 F.3d at 219 ("It does not follow, of course, that the Confrontation Clause of

---

[5] See Doc. No. 463 at 6 (stating both that "the Court created a reversible error during trial when [Defendant] was not permitted to expose [] Miller's bias toward[] him" and that "[t]he Court committed a reversible error because this evidence was proper impeachment evidence").

the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges . . . [may] impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant.").

The United States Court of Appeals for the Third Circuit recognizes "a two-part test to determine whether a particular limitation on cross-examination violated a defendant's rights under the Confrontation Clause." See Noel, 905 F.3d at 268 (citing Chandler, 326 F.3d at 219). Accordingly, a court must determine: (1) whether the evidentiary ruling at trial "significantly inhibited [the defendant's] effective exercise of her right to inquire into [the] witness's 'motivation in testifying'"; and (2) "if the [d]istrict [c]ourt's ruling did significantly inhibit [the defendant's] exercise of that right, whether the constraints it imposed on the scope of [the defendant's] cross-examination fell within those 'reasonable limits' which a trial court, in due exercise of its discretion, has authority to establish." See Chandler, 326 F.3d at 219.

### 2. Arguments of the Parties

In support of his argument that the Court erroneously prevented him from impeaching Miller, Defendant states that at trial, he attempted to establish bias on the part of Miller on the grounds that Miller is "a Neo-Nazi," while Defendant "comes from an interracial family." (Doc. No. 463 at 6.) According to Defendant, the Court did not allow him "to fully articulate his objection on why this information was proper impeachment evidence," referring to the exchange between the Court, Defendant, and counsel for the Government, as detailed supra. (Id.) Defendant states, in sum, that "[t]he Court committed a reversible error because this evidence was proper impeachment evidence" and by "[f]ailing to allow [] Defendant to present this

evidence to the jury," the Court denied him "the ability to attack [] Miller's credibility and expose to the jury his bias toward[]" Defendant. (Id. at 6-7.) Defendant further states that "[i]t is reasonable to conclude that" he would have "been found not guilty of the York County bank robbery if this evidence was admitted." (Id. at 7.) The aforementioned assertions appear to be the extent of Defendant's arguments as to this prong of his motion.

In opposition, the Government asserts that Defendant is incapable of demonstrating that the Court's limitation on his cross-examination of Miller was erroneous. The Government argues primarily that "in order to establish any harm, [] [D]efendant would have had to establish not just that [] Miller had been or was a 'Neo-Nazi,' but that he personally harbored feelings of bias toward members of interracial families at the time of his testimony" and then, he "would have had to not only establish that he is a member of an interracial family, but that [] Miller was also aware of that fact and harbored bias toward him." (Doc. No. 468 at 11.) The Government then states, "[t]o that point, the [G]overnment has to admit that through the course of an investigation that began nearly three years ago, this is the first indication it has received that [] [D]efendant is a member of an interracial family." (Id.) In addition, the Government posits that Defendant's ability to demonstrate bias on the part of Miller in this regard is questionable, "given the fact that [Defendant] and Miller committed both the York and Oley robberies together." (Id. at 11-12.) "For these reasons," the Government contends, "to allow [] [D]efendant to enter into such a line of questioning would undoubtedly have led to confusion and potential prejudice against Miller for evidence that would have been marginally relevant at best." (Id. at 12.)[6]

---

[6] The Government also asserts that even if Defendant "could have established bias and should have been allowed to cross examine Miller on that basis, the Court's denial of [Defendant's] request was harmless error." (Doc. No. 468 at 12.) As stated by the Government, the relevant case law requires a court to examine certain factors, including: the importance of the given witness's testimony; whether the testimony was cumulative; whether there was evidence to

### 3. Whether Defendant is Entitled to a New Trial Based on the Limitation on Defendant's Cross-Examination of Miller

Upon review of the record, the parties' arguments, and the applicable law, the Court finds no error in its limitation on Defendant's cross-examination of Miller at trial. As noted <u>supra</u>, in order to assess whether Defendant's rights under the Confrontation Clause were violated, the Court must resolve the following questions: (1) whether the evidentiary ruling challenged by Defendant significantly inhibited his effective exercise of his right to inquire into Miller's motivation in testifying; and (2) if the ruling did so inhibit Defendant, whether the constraints the ruling imposed on the scope of Defendant's cross-examination of Miller "fell within those 'reasonable limits' which a trial court, in due exercise of its discretion, has authority to establish." <u>See</u> <u>Chandler</u>, 326 F.3d at 219. Applying this standard, the Court is unpersuaded that Defendant's rights under the Confrontation Clause were violated.

First, the Court's ruling as to the relevant portion of Defendant's cross-examination of Miller did not "significantly inhibit" Defendant's effective exercise of his right to inquire into Miller's motivation in testifying at Defendant's trial. The trial transcript demonstrates that Defendant questioned Miller about certain of his previous criminal offenses and whether, in connection with those offenses, Miller was aware "that cooperating with law enforcement would, in fact, get [him] a better deal." (Doc. No. 400 at 216:20-25, 217:1-14.) At a subsequent point during the cross-examination, Defendant questioned Miller specifically about his prosecution as part of the instant case, including his sentencing, and the fact that Miller's sentence was, at the time of the testimony, "being delayed until [Miller] provide[d] this testimony in this [C]ourt[,]"

---

corroborate or contradict the testimony in a material way; the extent of the subject cross-examination; and the overall strength of the Government's case. (<u>Id.</u>) (citing <u>Van Arsdall</u>, 475 U.S. at 684). According to the Government, all of the aforementioned factors "are undoubtedly in the [G]overnment's favor." (<u>Id.</u>)

to which Miller responded by answering in the affirmative.  (<u>Id.</u> at 232:19-25, 233:1-10.)

Additionally, Defendant probed Miller as to information regarding the addendum to his plea

agreement and the possibility that the Government could "make a recommendation" as to

Miller's sentence as a result of him testifying on its behalf at Defendant's trial.  (<u>Id.</u> at 233:14-25,

234:1-8.)  It is apparent from the trial transcript that Defendant was afforded ample opportunity

to question Miller as to possible sources of bias, such as a possible reduced penalty in exchange

for his testimony against Defendant, which weighs against a finding of a Confrontation Clause

violation in this instance.  <u>See</u> <u>United States v. Newbern</u>, 451 F. App'x 242, 247 (3d Cir. 2011)

(citing <u>Van Arsdall</u>, 475 U.S. at 679) ("[A] trial judge is not required to allow inquiry into every

potential basis for bias."); <u>see also</u> <u>Van Arsdall</u>, 475 U.S. at 679 (quoting <u>Delaware v. Fensterer</u>,

474 U.S. 15, 20 (1985)) ("[T]he Confrontation Clause guarantees an <u>opportunity</u> for effective

cross-examination, not cross-examination that is effective in whatever way, and to whatever

extent, the defense might wish.").  Because, under the first prong of the relevant inquiry, no

Confrontation Clause violation occurred, the Court need not address the second portion of the

two-part test described above.[7]  Accordingly, the subject limitation on Defendant's cross-

---

[7] Even under the second prong –if the ruling did impermissibly inhibit Defendant, whether the
constraints the ruling imposed on the scope of Defendant's cross-examination of Miller "fell
within those 'reasonable limits' which a trial court, in due exercise of its discretion, has authority
to establish[,]" <u>see</u> <u>Chandler</u>, 326 F.3d at 219 – Defendant's challenge would still lack merit
because the apparent subject on which Defendant sought to question Miller, his alleged "Neo-
Nazi" views and their relationship to Defendant, is generously described as having questionable
relevance, and the Court acted within its discretion in limiting the testimony so as to mitigate
against "harassment, prejudice, confusion of the issues . . . or interrogation that is . . . only
marginally relevant."  <u>See</u> <u>Van Arsdall</u>, 475 U.S. at 679.
    Additionally, although the limitation on Defendant's cross-examination of Miller was not
erroneous, even if it were deemed erroneous, such an error would be harmless, given the nature
and extent of the inculpatory evidence presented to the jury as to Defendant.  <u>See, e.g.</u>, <u>United
States v. Ferguson</u>, 394 F. App'x 873, 885 n.9 (3d Cir. 2010) ("We note that, even if we were to
find that the District Court's choice violated the Confrontation Clause, we would hold the error

examination of Miller was not in error, and Defendant is not entitled to a new trial on this ground.

**C.      Information Contained in Ryan Miller's Plea Agreement Pertinent to Defendant**

Defendant also asserts that a new trial is warranted because "Miller's plea agreement contained information on bad acts against [] Defendant" in that the agreement contained evidence within the scope of Federal Rule of Evidence 404(b) "against [] Defendant pertaining to an [Oley] Township bank robbery."  (Doc. No. 463 at 7.)  According to Defendant, he is entitled to a new trial because "[t]he [G]overnment failed to provide [him] with notice that such evidence was contained within the plea agreement" and Defendant "failed to object to this issue due to the fact that he was unable to review this plea agreement prior to trial." (Id. at 8.)  Miller's plea agreement was entered into the record as a Government exhibit at trial.  (Doc. No. 400 at 237:3-11.)

**1.      Applicable Legal Standard**

Federal Rule of Evidence 404(b) provides that while "[e]vidence of a crime, wrong, or other act, is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identify, absence of mistake, or lack of accident." See Fed. R. Evid. 404(b).  Further, "[o]n request by a defendant in a criminal case, the prosecutor must: (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and (B) do so before trial – or during trial if the [C]ourt, for good cause, excuses lack of pretrial notice."  Fed.

_____

harmless in light of the overwhelming weight of the evidence proffered against [the defendant]." (citing United States v. Lore, 430 F.3d 190, 208 (3d Cir. 2005))).

R. Evid. 404(b)(2). "To be admissible under Rule 404(b), evidence of uncharged crimes or wrongs must (1) have a proper evidentiary purpose; (2) be relevant; (3) satisfy Rule 403; and (4) be accompanied by a limiting instruction (where requested) about the purpose for which the jury may consider it." United States v. Green, 617 F.3d 233, 249 (3d Cir. 2010) (citing United States v. Butch, 256 F.3d 171, 175 (3d Cir. 2001)).

### 2. Arguments of the Parties

Defendant appears to assert that Miller's plea agreement contained evidence "against [] Defendant pertaining to an [Oley] Township bank robbery," and because the plea agreement was entered into evidence following Miller's testimony, Rule 404(b) was implicated. (Doc. No. 463 at 7.) According to Defendant, the Government did not provide him with the requisite notice for purposes of Rule 404(b) "that such evidence was contained within the plea agreement" and Defendant did not object to the admission of the agreement at trial only because "he was unable to review this plea agreement prior to trial." (Id. at 8.)[8] Defendant maintains that "[t]his evidence revealed prejudicial evidence of alleged bad acts against [] Defendant and [] Miller" and, therefore, violated Rule 404(b). (Id.)

In response, the Government argues that Defendant was not biased as a result of the introduction of Miller's plea agreement, stating that none of the relevant documents – the plea agreement, plea addendum, or trial transcript – refers to the Oley Robbery, and, in turn, could not possibly link Defendant to this robbery. (Doc. No. 468 at 14.) The Government further states that "[t]he plea agreement simply states that Miller will plead guilty to a superseding felony information" that "will charge him with two counts of armed bank robbery, one count of

---

[8] Defendant states that his "failure to recognize this error at trial was not a product of a strategic approach but a byproduct of sleep deprivation caused by the condition[s] of confinement in [the Dauphin County Prison]." (Doc. No. 463 at 8.)

brandishing a firearm in furtherance of a crime of violence and one count of [being a] felon in possession of a firearm" and "[t]he Oley Robbery is only mentioned in the superseding information, which was not introduced at trial." (<u>Id.</u> at 15.)

**3.    Whether Defendant is Entitled to a New Trial Based on Information in Ryan Miller's Plea Agreement**

The Court concludes that, upon review of the relevant legal standard, the parties' positions, and the record in this case, Defendant is not entitled to a new trial on this ground because Defendant was not subject to any bias as a result of Miller's plea agreement being admitted into evidence.  As an initial matter, the Court notes that the parties do not dispute the requirements imposed by Rule 404(b).  Here, however, the mandates of this Rule have not been implicated, for, as the Government notes, Miller's plea agreement states only the charges to which Miller would plead guilty, and the Oley Robbery is mentioned only "in the superseding information, which was not introduced at trial." (Doc. No. 468 at 15.)  A review of the relevant documents indicates that the Government's contention is correct.  The plea agreement, entered into evidence during Defendant's trial as Exhibit 152, does not refer to this bank robbery. Moreover, while the superseding information in Miller's criminal case does refer to this robbery (Doc. No. 90, 1:16-cr-00241-JEJ-2), the superseding information was not entered into evidence as an exhibit in Defendant's trial.  As a result, the Court finds that Rule 404(b) is not implicated as to Defendant, and, accordingly, Defendant is not entitled to a new trial on this ground.

**D.    Defendant's Conditions of Confinement at the Dauphin County Prison**

Defendant also alleges that a new trial is warranted because the conditions of his confinement at the Dauphin County Prison, where he was housed during the trial proceedings, violated his Due Process Rights.  (Doc. No. 463 at 9.)  During the trial, Defendant asserted, <u>inter alia</u>, the following:

> MR. PELKER: All right? But I do wish, can I take this time to state some objections now that the jury is not in the room?
>
> THE COURT: Sure.
>
> MR. PELKER: When we started trial, I objected to the housing at Dauphin County due to the fact that I'm waking up at 3:30 in the morning to eat, 6:30 to get ready for trial. I'm not getting sleep. I believe that that will infringe upon my fair trial right. Also that I'm not being provided law library right now because I'm in trial. I want to renew that, and I want that to be a continuous objection throughout this trial, however long this goes.

(Doc. No. 402 at 661:9-20.) Accordingly, the Court examines Defendant's argument that because of the conditions of his housing at the Dauphin County Prison during the trial proceedings, his due process rights were violated, and, therefore, he is entitled to a new trial.

### 1.    Applicable Legal Standard

"The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment." Yohn v. Love, 76 F.3d 508, 516 (3d Cir. 1996) (quoting Strickland v. Washington, 466 U.S. 668, 684-85 (1984)). The Sixth Amendment to the United States Constitution provides that:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

U.S. Const. amend. VI.

"Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice. In order to declare a denial of it, [the Court] must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.'" United States v. Bianchi, 594 F. Supp. 2d

532, 539 (E.D. Pa. 2009) (alteration in original) (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 972 (1982)).  The fairness of a trial is fundamentally a matter of due process.  See, e.g., Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 876 (2009) ("It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" (quoting In re Murchison, 349 U.S. 133, 136 (1955))).

## 2.    Arguments of the Parties

Defendant asserts that he is entitled to a new trial because "his Fifth Amendment right under the United States Constitution to due process was violated when he was subjected to condition[s] of confinement at [the Dauphin County Prison]" that resulted in him experiencing sleep deprivation at trial.  (Doc. No. 463 at 9.)  More specifically, Defendant states that as a result of such sleep deprivation during the course of his trial, "he struggled and at times missed objecting to issues at trial" and his "strategy at trial was altered due to being sleep deprived" in that he "clearly intended to call witnesses for his defense[,] [b]ut with his altered and sleep deprived mind," he "failed to do so."  (Id.)  Further, Defendant maintains that he experienced "difficulty remembering and articulating his positions and objections."  (Id.)[9]  According to Defendant, he "was subjected to [twenty-four] hours of bright lighting, loud noises through the entire night, and absurd prison scheduling[,] such as eating breakfast at 3:00 a.m."  (Id. at 10.)  According to Defendant, therefore, such conditions "interfered with his ability to present an adequate defense at trial" and "[i]t is reasonable to conclude that the outcome of [] [his] trial would [have] been different," were it not for the sleep deprivation of which he complains.  (Id.)

---

[9] Defendant additionally asserts that he "made numerous objections pertaining to being sleep deprived prior to and during trial."  (Doc. No. 463 at 10.)

In response to the above argument, the Government states that "[l]ike [D]efendant's stand-by counsel," it "finds the argument quite unique and has also been unable to find authority directly on point." (Doc. No. 468 at 15.)[10]  The Government notes, though, that because "the issue appears to be [] [D]efendant's ability to adequately represent himself," Defendant "would have to establish some type of harm – which he has failed to do." (Id.)  The Government adds that in his motion, Defendant "only lists two specific issues which were caused by his alleged sleep deprivation: (1) he did not object to the introduction of Ryan Miller's plea agreement . . . [and] (2) he intended to call witnesses at trial, but failed to do so." (Id. at 16) (footnote omitted).  Further, the Government states that as to Defendant's ability to call witnesses, despite his contentions described supra, Defendant "had ample time to make a decision regarding whether he was going to call witnesses[,] as well as the assistance of stand-by counsel." (Id.)  In support of his point, the Government states that it "rested on day three of trial and the Court released the jury for an [eighty]-minute lunch break[,]" and Defendant "then notified the Court that he was not calling any witnesses and made several well thought out and reasoned objections." (Id.)  Additionally, the Government posits that the evidence presented against Defendant at trial "was so overwhelming[] that any alleged 'sleep deprivation' would be irrelevant[,]" in light of evidence such as testimony from cooperating witnesses who "directly participated" in certain armed robberies with Defendant" and testimony regarding the purchase and disposal of certain weapons related to the armed robberies. (Id. at 17-18.)  Consequently, the

_____

[10] The Government appears to refer to correspondence between Defendant and his standby counsel, which Defendant submitted to the Court in connection with the instant motion, and which refers to the potential legal bases for the arguments presented in Defendant's motion as to the conditions at the Dauphin County Prison during Defendant's trial. (Doc. No. 468 at 15) (citing Doc. No. 463-1 at 2).

Government argues, "[i]n the face of this evidence, it is wholly irrelevant that [] [D]efendant may have been tired at trial." (Id.)

### 3. Whether Defendant is Entitled to a New Trial Based on his Conditions of Confinement at the Dauphin County Prison During Trial

The Court finds that Defendant is not entitled to a new trial on the basis of purported sleep deprivation due to his conditions of confinement at the Dauphin County Prison during his trial proceedings. As a threshold matter, the Court agrees with the Government that Defendant's asserted basis for a new trial in this regard presents a novel legal issue; Defendant provides no legal authority to support his arguments outlined supra, and the Court is unable to locate any such authority. While Defendant does cite certain case law regarding the constitutionality of prison conditions (Doc. No. 463 at 10), such case law is inapposite for purposes of the instant motion because it discusses prison conditions in the context of claims asserted pursuant to 42 U.S.C. § 1983, rather than in the context of a motion for a new trial in a criminal case. Moreover, the record in this case speaks for itself in demonstrating that Defendant was unhampered in presenting an adequate defense at trial. It bears noting that Defendant's representations as to the conditions at the Dauphin County Prison were neither made under oath nor tested, but even assuming the truthfulness of Defendant's assertions, these arguments are outside the ambit of this Court's authority for purposes of his post-trial motion, and, therefore, do not entitle Defendant to relief pursuant to Federal Rule of Criminal Procedure 33. Accordingly, the Court will deny Defendant's motion for a new trial on this ground.[11]

### E. Statements by Counsel for the Government During Closing Arguments

---

[11] To the extent Defendant requests a hearing to permit him to present expert testimony on this matter, the Court will also deny this request on the basis that Defendant has failed to make any showing, beyond his mere assertions, that he was deprived of sleep at trial such that his ability to present a defense was adversely affected.

Defendant asserts that during the rebuttal phase of the Government's closing argument at trial, Assistant United States Attorney Scott Ford ("Attorney Ford") "committed prosecutorial misconduct when he made false statements in his closing arguments[,] warranting a new trial." (Id. at 11.)  Defendant takes issue with a portion of Attorney Ford's statement wherein he allegedly falsely stated that the Government "didn't pick the witnesses" who testified for the Government and against Defendant at trial.  (Id.)  The relevant portion of the record reads as follows:

> [MR. FORD:] And the third point, ladies and gentlemen, we didn't pick the witnesses.  Ladies and gentlemen, I don't think any of us would enter into a criminal conspiracy with any of these witnesses.  But at the end of the day, these were the individuals that were involved in this bank robbery, and these were the individuals that the defendant conspired with.

(Doc. No. 403 at 721:7-12.)  The Court, therefore, examines whether Defendant is entitled to a new trial based on the aforementioned statement by Attorney Ford, which Defendant asserts is false.

### 1.    Applicable Legal Standard

A defendant may allege prosecutorial misconduct as a basis for relief in a Rule 33 motion for a new trial.  See, e.g., United States v. Ford, 618 F. Supp. 2d 368, 381 (E.D. Pa. 2009) (noting that because the defendant had "raised his misconduct claims post-trial, they are governed by Federal Rule of Criminal Procedure 33, under which the district court has the discretion to vacate a judgment of conviction 'if the interest of justice so requires'").  "Improper prosecutorial conduct rises to the level of constitutional error when it 'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process in light of the entire proceeding.'"  United States v. Elwell, 515 F. App'x 155, 163 (3d Cir. 2013) (alteration in original) (quoting United States v. Morena, 547 F.3d 191, 193-94 (3d Cir. 2008)).  When a court

considers "whether alleged prosecutorial misconduct has cast an impermissible taint upon a trial," a court "ask[s] whether the alleged misconduct . . . was 'sufficiently prejudicial' to violate a defendant's due process rights."  See United States v. Bates, 46 F. App'x 104, 110 (3d Cir. 2002) (quoting United States v. Scarfo, 685 F.2d 842, 849 (3d Cir. 1982)).  "In order for prosecutorial misconduct to merit a reversal, however, [the] Court must find that it is more probable than not that the alleged misconduct influenced the jury's ultimate verdict."  Id. (citing United States v. Simtob, 901 F.2d 799, 806 (9th Cir. 1990)).

The analysis governing a claim of prosecutorial misconduct "proceeds in two steps."  See United States v. Welshans, 892 F.3d 566, 573 (3d Cir. 2018) (citing United States v. Liburd, 607 F.3d 339, 343 (3d Cir. 2010)).  Under this analysis, the Court must first "consider whether there was misconduct," and, if such misconduct did occur, "proceed to determine whether that misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process, taking into account the entire proceeding."  See id. (internal quotation marks omitted) (quoting United States v. Repak, 852 F.3d 230, 259 (3d Cir. 2017)).  In doing so, the Court is to "consider 'the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant.'"  See id. (quoting Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001)).

A claim of prosecutorial misconduct that was not raised at trial is reviewed for plain error.  See, e.g., United States v. Welshans, 892 F.3d 566, 573 (3d Cir. 2018) ("We review an unpreserved prosecutorial misconduct claim for plain error." (citing Gov't of the Virgin Island v. Mills, 821 F.3d 448, 456 (3d Cir. 2016))).  "The plain error test requires (1) an error; (2) that is 'clear or obvious'; and (3) 'affected the defendant's substantial rights . . . which in the ordinary

case means he or she must 'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." Id. (quoting Molina-Martinez v. United States, __ U.S. __, 135 S. Ct. 1338, 1343 (2016)). If the aforementioned elements are satisfied, the error is to be corrected "if it 'seriously affects the fairness, integrity[,] or public reputation of judicial proceedings.'" See id. (quoting Molina-Martinez, 135 S. Ct. at 1343).

### 2. Arguments of the Parties

Defendant asserts that Attorney Ford's statement that the Government "didn't pick the witnesses" amounts to prosecutorial misconduct because it was a false statement. (Doc. No. 463 at 11.) Defendant claims that while he had "presented to the jury the fact that the [G]overnment only presented them witnesses [who] were federally indicted in this matter[,]" and stated in his own closing argument that the Government "kept every single person that hasn't been charged in this incident off that stand" and presented "people they had leverage on" as witnesses, Attorney Ford's comment was "obviously false and undermined [] Defendant's complete theory of defense and rendered the trial fundamentally unfair." (Id. at 12.)[12]  In response, the Government argues that "[t]here is absolutely nothing improper about this statement[,]" and Defendant's arguments are meritless because "the statement is simply pointing out that the [G]overnment called the witnesses who could present relevant evidence, which is not accurate or misleading." (Doc. No. 468 at 18.)  Further, the Government contends that "[e]ven if the comments were somehow improper, they clearly do not require a retrial" because "the comments did not manipulate or misstate the evidence, nor did they implicate other specific rights of the accused

---

[12] Defendant states that although he "failed to object to this issue [at trial] due to sleep deprivation," the challenged statement by Attorney Ford "amounts to a plain error." (Doc. No. 463 at 12.)

such as [] the right to counsel or the right to remain silent." (Id. at 18-19.) Accordingly, the Government contends that the challenged statement does not warrant a new trial.

> ### 3. Whether Defendant is Entitled to a New Trial Because of Statements Made by Counsel for the Government in the Government's Rebuttal During Closing Arguments

The Court concludes that Defendant is not entitled to a new trial on the basis of Attorney Ford's comment that the Government "didn't pick the witnesses." As an initial matter, the Court notes that because Defendant did not object to this statement at trial, the Court examines the permissibility of this statement for plain error.[13] See, e.g., Welshans, 892 F.3d at 573. Under this standard, therefore, Attorney Ford's statement must have constituted "(1) an error; (2) that is clear or obvious; and (3) [that] affected [] [D]efendant's substantial rights," which would require "a reasonable probability that, but for the error the outcome of the proceeding would have been different." See id. (internal quotation marks omitted) (quoting Molina-Martinez, 135 S. Ct. at 1343). The Court finds that when judged against this standard, Attorney Ford's statement was not plainly erroneous. First, it is questionable whether the statement was an error. When situated within the context of the remainder of this portion of his argument, it is apparent that Attorney Ford said "we didn't pick the witnesses" to offer a rebuke to any argument by Defendant as to their credibility, as evidenced by his subsequent statements that while he didn't "think any of us would enter into a criminal conspiracy with any of these witnesses . . . at the end of the day these were the individuals that were involved in this bank robbery, and these were the individuals that the defendant conspired with." (Doc. No. 403 at 721:7-12.) See, e.g., United States v. Pungitore, 910 F.2d 1084, 1127 (3d Cir. 1990) (finding no plain error as a result of the

---

[13] To the extent Defendant has asserted that any failure to make such an objection resulted from sleep deprivation, the Court incorporates its discussion of Defendant's argument as to sleep deprivation, as explained supra, herein.

prosecutor's comment where "[t]he rebuttal summation did not more than refute what was an obvious inference from the appellants' closing arguments"); see also e.g., United States v. Young, 470 U.S. 1, 11 (1985) ("Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutors' conduct affected the fairness of the trial.").

Further, even if Attorney Ford's statement were deemed to constitute an error, such an error was neither clear nor obvious, and there is no showing that, but for the statement, Defendant's trial would have resulted in a different outcome. It bears noting that Defendant provides no basis for the Court to find that either of these analytical prongs has been satisfied, but rather, offers only conclusory arguments in support of his argument as to prosecutorial misconduct. (Doc. No. 463 at 11-12.) Moreover, as explained supra, the logical interpretation of Attorney Ford's comment dispels any notion that any error was either clear or obvious, and the Court is unpersuaded that it should assign a meaning to Attorney Ford's statement other than that which is apparent from the record in this case. In addition, there simply is no indication that, but for Attorney Ford's statement that the Government "didn't pick the witnesses," the jury in this case would have reached a different verdict. Indeed, the overwhelming inculpatory testimony and evidence presented at trial contradicts any such notion. Accordingly, the Court finds that Attorney Ford's statement was not plainly erroneous.

Even if the statement were not examined for plain error, Defendant's argument as to prosecutorial misconduct on the basis of Attorney Ford's statement generally would still lack merit. In this regard, the Court is concerned with (1) whether the statement amounted to misconduct, and (2) if so, whether that misconduct "so infected [Defendant's] trial with

unfairness as to make the resulting conviction a denial of due process, taking into account the entire proceeding." See Welshans, 892 F.3d at 573 (internal quotation marks omitted) (quoting Repak, 852 F.3d at 259). As noted supra, when Attorney Ford's statement, albeit sardonic in tone, is properly viewed in connection with the remainder of his closing argument, the statement does not constitute misconduct. See, e.g., Amodio v. Warren, Civ. No. 13-4355, 2017 WL 5998757, at *17 (D.N.J. Dec. 4, 2017) (recognizing absence of "controlling authority stating that a prosecutor's use of sarcasm in a summation is constitutionally improper"). Further, even if this Court were to find that such misconduct occurred, nothing in the record suggest that, in light of Attorney Ford's actions and the in context of the entire trial, the comment tainted Defendant's trial with unfairness such that he was denied due process. Rather, Attorney Ford's rhetorical comment ostensibly functioned to account for any perceived lack of credibility on the part of the Government's witnesses, and the Court is unpersuaded that this comment deprived Defendant of due process so as to warrant a new trial. See, e.g., Welshans, 892 F.3d at 577-78 (stating that in examining whether alleged prosecutorial misconduct resulted in the denial of due process, the Court shall not "merely consider the sufficiency of the evidence[,]" but rather, "also take into account whether the misconduct 'shaped the development of the record evidence . . . or the trial strategy pursued by either party'" (quoting Liburd, 607 F.3d at 345)). Accordingly, the Court will deny Defendant's motion for a new trial on this ground.

**F.    Prejudice to Defendant Allegedly Caused by Witnesses for the Government**

Next, Defendant posits that he is entitled to a new trial "due to the fact that the [G]overnment, through their witnesses, exposed the fact that he was in a halfway house and incarcerated[,]" and, therefore, caused him impermissible prejudice in front of the jury. (Doc. No. 463 at 13.) Defendant appears to refer to two instances in which witnesses Miller and

Special Agent Geoffrey Ford ("Special Agent Ford"), respectively testified such that they alluded to Defendant's prior incarceration in the presence of the jury.

The relevant portion of Miller's testimony, which occurred in the course of his direct examination by Attorney Ford, is copied below:

> Q. All right. Now, Mr. Miller, you mentioned that – going back to the firearm that the defendant purchased, after – or Ms. Steiner purchased. After Ms. Steiner purchased that firearm for the defendant, did he carry it?
>
> A. Yes.
>
> Q. And how often did he carry it?
>
> A. He was in the halfway house most of the time, so he didn't carry it all the time.
>
> MR. PELKER: Objection, Your Honor.
>
> MR. FORD: Your Honor, we'd ask that that be stricken from the record.
>
> THE COURT: The answer will be stricken from the record. Jurors, as I told you at the outset –
>
> MR. PELKER: Your Honor, I'm moving – I would like to move for a mistrial.
>
> THE COURT: Let me finish. When testimony is ordered stricken from the record, you must ignore it as though it has never been heard.

(Doc. No. 400 at 195:11-25, 196:1-3.) Subsequently, and outside the presence of the jury, the following discussion occurred between the Court and the parties:

> THE COURT: Okay. I want to remind you to make an effort to reiterate with your witnesses –
>
> MR. FORD: Yes, Your Honor.
>
> THE COURT: – that they're not to make any references to any prior incarceration or any prior convictions of the defendant.
>
> MR. FORD: Yes, Your Honor.
>
> THE COURT: All right.

MR. PELKER: Your Honor, may I state something on the record real quick?

THE COURT: Yes.

MR. PELKER: During that ordeal of Ryan Miller's statement of the halfway house, I did move for a mistrial, and I'm just asking the courts to please rule on the record on that motion.

THE COURT: Right, absolutely. I, as you know, had instructed the jury immediately to disregard the statement. I ordered it stricken. I don't believe there are grounds for a mistrial at this point, but I will certainly reconsider the motion if it happens again. Mr. Ford is on notice.

MR. PELKER: Thank you, Your Honor.

(Doc. No. 400 at 281:14-25, 282:1-9.)

Defendant also takes issue with a statement made by Special Agent Ford, who testified on direct examination as follows:

Q. And have you heard Lauren Mohn's voice?

A. Yes, I have.

Q. How many times?

A. We've interviewed her twice. I've also listened to some phone calls that Derek Pelker has made to her from various prisons.

Q. And have you heard the defendant's voice during the course of this investigation?

A. Yes, I have.

Q. And how have you heard his voice?

A. We have –

MR. PELKER: Object. Prejudice.

THE COURT: Overruled.

THE WITNESS: I've met with the defendant on a number of occasions. I've also listened to his voice throughout this trial. I've also heard his voice on prison phone calls.

30

BY MR. FORD:

Q. And I'd like to now play for you Government Exhibit 58.

MR. PELKER: Your Honor, I would like to have a sidebar.

THE COURT: All right.  Ms. Weida, would you take the jury out.  (Jury leaves courtroom.)

THE COURT: Mr. Pelker.

MR. PELKER: All right.  Your Honor, this is a several-layered matter, so I'm going to start with the first one.  Special Agent Ford stated that I was in prison and that these, in fact – I'm incarcerated.  And I believe that this was already discussed, that the fact that I'm in prison and was on parole or any priors should not be addressed.  I said it prior to trial commencing.  We had another witness say this before.  He just stated this now.  I'm moving for a mistrial stating that this prejudice is overwhelming.  The jury – it's too easy for the jury to conclude that I am, in fact, incarcerated.

And if anyone on that jury knows about what a halfway
house is already knows that I have a prior.  And I just believe that the prejudice is outweighing this to mandate a mistrial in this matter.

. . .

THE COURT: Okay. Mr. Pelker, your concerns go to the weight of the evidence.  And, of course, you're entitled to question the witness on the items that you raise.  But the government has established an adequate foundation for admission because of the testimony of the agent that he knows your voice and Ms. Mohn's voice.  I would instruct the agent to avoid making any reference to the manner in which the calls were collected unless specifically inquired by the defendant.  I've instructed other witnesses not to allude to the fact that he was incarcerated.

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

MR. PELKER: Your Honor, can you rule on the motion for a mistrial, though?

THE COURT: I will.  I'm ruling that the motion for a mistrial is denied.  I don't find an adequate basis for a mistrial.  The agent testified that there was a prison call that he overheard, and it is – as the government's lawyer has pointed out, it's made part of the record in this case that the defendant was arrested.  It's also not at all clear who was in prison.  It may well have been Ms. Mohn whose calls were

being monitored. There's been no reference to the defendant specifically being in prison. So I don't find any basis for prejudice that would warrant a mistrial in the matter.

(Doc. No. 402 at 616:14-25, 617:1-25, 618:1-3, 621:2-25, 622:1-2.) Accordingly, the Court examines whether Defendant was impermissibly prejudiced and, therefore, entitled to a new trial, as a result of testimony described supra.

### 1.    Applicable Legal Standard

Courts recognize a general concern that the introduction of evidence or testimony as to a "defendant's criminal record in order to prove [a] weapons possession charge would prejudice the defendant during the jury's deliberations on other counts." See United States v. Joshua, 976 F.2d 844, 848 (3d Cir. 1992), abrogated on other grounds, Stinson v. United States, 508 U.S. 36 (1993); see also, e.g., United States v. Lashley, No. 09-cr-307, 2011 WL 5237291, at *12 (E.D. Pa. Nov. 3, 2011) (recognizing "that a trial court may, in its discretion, sever a latter charge involving a prior conviction in order to mitigate prejudice to the defendant during the jury's consideration of the other charges" (citing Joshua, 976 F.2d at 847)). Similarly, reference to a defendant's incarceration before a jury "may, in certain circumstances, violate a defendant's due process right to a fair trial." See United States v. Faulk, 53 F. App'x 644, 647 (3d Cir. 2002) (quoting Estelle v. Williams, 425 U.S. 501, 512-13 (1976)). Consistent with this concept, the United States Supreme Court has "emphasized that 'the constant reminder' to the jury over the course of a trial that the defendant is a prisoner may impair the presumption of innocence." See id. (quoting Estelle, 425 U.S. at 504).

Whether to grant a motion for a mistrial "based on a witness's allegedly prejudicial comments" is within the discretion of the district court. See United States v. Riley, 621 F.3d 312, 335-36 (3d Cir. 2010) ("We review the denial of a motion for a mistrial based on a

witness's allegedly prejudicial comments for an abuse of discretion." (quoting <u>United States v.</u> <u>Lore</u>, 430 F.3d 190, 207 (3d Cir. 2005))). This "inquiry focuses on whether any conduct at trial was so prejudicial that [the] defendant was deprived of a fundamental right." <u>United States v.</u> <u>Xavier</u>, 2 F.3d 1281, 1285 (3d Cir. 1993) (citing <u>United States v. DeRosa</u>, 548 F.2d 464, 473 (3d Cir. 1977)). "Three factors must be analyzed to determine whether the defendant was prejudiced: '(1) whether [the witness's] remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury; (2) the strength of the other evidence; and (3) curative action taken by the district court.'" <u>Riley</u>, 621 F.3d at 336 (quoting <u>Lore</u>, 430 F.3d at 207).

## 2.     Arguments of the Parties

Defendant asserts that he should be granted a new trial because the testimony from the aforementioned witnesses – Miller and Special Agent Ford – as described above, caused him impermissible prejudice. (Doc. No. 463 at 13.) According to Defendant, "the cumulative prejudicial effect of Mr. Miller's comment and Mr. Pelker explaining that [Defendant] went to a halfway house after being released from prison[] made it obvious that [] Defendant has been incarcerated before." (<u>Id.</u> at 14.) Defendant also posits that Special Agent Ford's comment regarding a phone call made from prison subjected him to such prejudice, as well, and that these witnesses "grossly infested his trial with prejudicial evidence which makes jurors bias[ed] and partial by exposing the fact that he has [prior convictions], was in a halfway house, and was incarcerated." (<u>Id.</u>) According to Defendant, "the cumulative effect of these comment[s] has rendered his trial unfair and a violation of his right to due process." (<u>Id.</u> at 15.)

In opposition, the Government states that Defendant is not entitled to a new trial based on the challenged testimony because the subject statements "were neither pronounced nor

persistent," and, therefore, under the relevant legal standard, did not prejudice Defendant such that a new trial is warranted. (Doc. No. 468 at 19.) To that end, the Government notes that Miller's testimony "consisted of one sentence, in passing, stated by Miller over the course of a five-day trial" and "Miller did not even state that [] [D]efendant was convicted of an offense, let alone the nature of the offense." (Id. at 20-21.) Further, the Government asserts that the evidence presented against Defendant "was remarkably strong" in that it consisted of "numerous cooperating witnesses detailing [his] involvement in the robberies[,]" and "the Court immediately instructed the jury to ignore the testimony and then reiterated that order in its closing instructions[,]" which the jury is presumed to have followed. (Id. at 21.) According to the Government, consequently, Miller's testimony does not warrant a new trial under the applicable legal standard. Further, as to the portion of Special Agent Ford's testimony challenged by Defendant, the Government contends that this statement too was neither pronounced nor persistent, "even when coupled with Miller's statement" as to the halfway house, and Special Agent Ford "made no mention of when [Defendant] was in prison or why he was in prison." (Id. at 22.) Further, the Government notes that "the jury had already heard evidence [that] [D]efendant had been arrested . . . following the Lebanon Robbery" and because Special Agent Ford's testimony "did not indicate the dates [on] which the calls were made, this allowed the jury to presume the calls were made subsequent to his arrest." (Id.) The Government argues that, therefore, "there was no basis for this Court to take any curative action" as to Special Agent Ford's testimony and, as a result, Defendant is not entitled to a new trial. (Id.)

**3. Whether Defendant is Entitled to a New Trial Because of Alleged Prejudice to Him Caused by the Government's Witnesses**

The Court concludes that Defendant is not entitled to a new trial on the basis of either Miller's testimony or that of Special Agent Ford. The Court examines the challenged statements from both witnesses separately.

### i.    Ryan Miller's Testimony

As an initial matter, the Court notes that because Defendant moved for a mistrial on the basis of Miller's testimony, which the Court denied, the proper inquiry is whether the Court acted in its discretion in denying Defendant's motion, and, in performing this analysis, the Court must examine the following factors in determining whether Defendant was prejudiced by Miller's testimony that mentioned Defendant previously being in a halfway house: (1) whether Miller's "remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury"; (2) "the strength of the other evidence" as to Defendant; and (3) the "curative action taken by the [] [C]ourt." See Riley, 621 F.3d at 336 (quoting Lore, 430 F.3d at 207). None of these elements demonstrates that the Court should have ordered a mistrial in regard to Miller's testimony.

First, the Court agrees with the Government that Miller's remarks were neither pronounced nor persistent, and, as a result, were unlikely to mislead or prejudice the jury. A review of the trial transcript reveals that Miller made, on only one instance, an isolated reference to Defendant living in a halfway house without any specific discussion of the details of Defendant's living arrangement involving the halfway house. (Doc. No. 400 at 195:17-18.) Defendant promptly lodged an objection, to which the Court responded immediately by striking the testimony and instructing the jury to disregard said testimony (id. at 195:22-23, 196:1-3), after which Miller refrained from making any mention of the halfway house or any other sort of form of incarceration involving Defendant. It is inconceivable, based on the record in this case,

that Miller's testimony could be considered "pronounced and persistent," or likely to mislead or prejudice the jury for purposes of the governing legal analysis. See United States v. Golson, 559 F. App'x 157, 160 (3d Cir. 2014) (agreeing with district court that the challenged testimony was not "pronounced and persistent" when the statement consisted of "a single comment made in the course of a three-day trial"); United States v. Edwards, 439 F. App'x 112, 115 (3d Cir. 2011) (concluding that witness's remark was not pronounced and persistent when the remark "accounted for only a few lines of testimony that spanned several days"); Riley, 621 F.3d at 336 ("[The] improper remarks consisted of two references to a 'work release program' in testimony that spanned three days over the course of a five week trial. Thus the remarks cannot be characterized as either pronounced nor persistent, nor were they systematic."). Accordingly, because Miller's remark was not pronounced and persistent, it follows that his comment would have been unlikely to mislead or invoke prejudice among the jury.

Second, the strength of the evidence presented against Defendant – including testimony from several individuals purportedly involved with the offenses with which Defendant was charged, testimony from victims of the offense, and evidence such as photographs depicting certain portions of the subject armed bank robberies – clearly negates any argument that Miller's isolated reference to a halfway house impacted the jury's deliberations to prejudice Defendant so as to warrant a mistrial. See Edwards, 439 F. App'x at 115 (affirming denial of a motion for a mistrial and noting that "the evidence against [the defendant] . . . was substantial" in that "[t]he jury heard testimony . . . that [the defendant] had joined him in carrying out the robbery" and it "saw video evidence of the robbery and testimony from the victims implicating [the defendant] as one of the assailants"); Lore, 430 F.3d at 207 (finding that a mistrial was not warranted on

account of a witness's statement where, <u>inter alia</u>, "the record contain[ed] strong evidence of the extent of [the defendant's] participation in the illegal schemes").

Third, the curative measures taken by the Court were sufficient so as to render a mistrial improper, for the record reflects that, immediately following Miller's reference, Defendant lodged an objection, to which the Court responded by striking the testimony and instructing the jury to disregard said testimony.  (Doc. No. 400 at 195:22-23, 196:1-3.)  As the Government aptly notes (Doc. No. 468 at 21), the Court reiterated this instruction in the final charge given to the jury (Doc. No. 403 at 725:19-23), which the jury is presumed to follow.  <u>See, e.g.</u>, <u>Edwards</u>, 439 F. App'x at 115 (stating that it is typically "presume[d] that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the [C]ourt's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant" (quoting <u>Greer v. Miller</u>, 483 U.S. 756, 767 n.8 (1987))).  Moreover, when the jury was not present, the Court reminded the Government that it needed to ensure its witnesses refrained from making such references (Doc. No. 400 at 282:4-8), an admonition that the Government evidently internalized in that its witnesses did not mention the halfway house again at trial.[14]  The measures that this Court took to mitigate any prejudice resulting from Miller's comment were sufficient to render a mistrial improper.  <u>See, e.g.</u>, <u>Golson</u>, 559 F. App'x at 161 (stating that "an instruction by the

_____

[14] The Court recognizes that Defendant also asserts that after Miller remarked that Defendant had spent time in a halfway house, another witness, Keith Pelker, "explain[ed] that he was in a halfway house after being released from prison[,]" which, according to Defendant, when combined with Miller's comment, prejudiced Defendant, as well.  (Doc. No. 463 at 14.)  Upon review of the record, the Court notes that the pertinent portion of Keith Pelker's testimony refers only to his (Keith Pelker's) involvement in a halfway house, and, therefore, does not implicate Defendant in this regard.  (Doc. No. 401 at 441:11-25, 442:1-17.)  Accordingly, the Court finds no basis for Defendant's argument that Keith Pelker's testimony regarding a halfway house could be prejudicial to him for purposes of the instant motion.

Court that the jury should ignore [the witness's] remark would have cured possible prejudice to [the defendant]"); see also, e.g., Xavier, 2 F.3d at 1285-86 (finding that a mistrial was unwarranted where "both the prosecutor and the trial judge admonished [the witness] to refrain from making [the] statements" that the defendant alleged were prejudicial). Accordingly, the Court will deny Defendant's motion for a new trial on the basis of Miller's testimony.

### ii.   Special Agent Ford's Testimony

The Court reaches a similar conclusion as to Special Agent Ford's testimony. Like Miller's comment, the portion of Special Agent Ford's testimony challenged by Defendant was neither pronounced nor persistent, as Special Agent Ford stated only that he had "listened to some phone calls that Derek Pelker has made to [Lauren Mohn] from various prisons." (Doc. No. 402 at 616:17-19.) Further, as noted supra, the overall strength of the inculpatory evidence presented as to Defendant weighs against a finding that Special Agent Ford's statement caused Defendant to be impermissibly prejudiced. Lastly, the remedial steps taken by the Court in response to Defendant's objection to this testimony were sufficient to mitigate against any such prejudice, for the Court specifically provided the following statement prior to the jury being brought back into the courtroom: "I would instruct the agent to avoid making any reference to the manner in which the calls were collected unless specifically inquired by the defendant. I've instructed other witnesses not to allude to the fact that he was incarcerated." (Doc. No. 402 at 621:8-12.) Following this instruction, Special Agent Ford made no apparent reference to the location from which the call was made or Defendant's prior incarceration.[15] Accordingly, the

---

[15] It bears noting that, in denying Defendant's motion for a mistrial, the Court stated that there was not "an adequate basis for a mistrial" in that "[t]he agent testified that there was a prison call that he overheard, and it is – as the government's lawyer has pointed out, it's made part of the record in this case that [] [D]efendant was arrested." (Doc. No. 402 at 621:18-22.)

Court concludes that it properly denied Defendant's motion for a mistrial, and, therefore, Defendant is not entitled to a new trial on this basis.

### G. Admission of Evidence Pertaining to Prison Phone Conversation

Lastly, Defendant posits that the Court erred in admitting into evidence, upon the request of the Government, a recording of a phone conversation ostensibly between Defendant and Lauren Mohn, Defendant's then-partner. (Doc. No. 463 at 15.) Prior to this recording being played before the jury, the following exchange occurred outside the presence of the jury:

> THE COURT: Okay. What's in the phone call, and why is it necessary to admit it?
>
> MR. FORD: In the phone call, Your Honor, the defendant tells Ms. Mohn, essentially, don't be mad at me, but I have to tell you something, I used to take your gun and use it and then I would replace it. We can play it, Your Honor. I believe it's about two minutes, less than. We could play it for you now, Your Honor, if you'd like.
>
> THE COURT: Okay. Let's hear it.
>
> MR. FORD: 158 – 58, I'm sorry. (Audio played.) Your Honor, I just want to confirm – I know we had some audio issues. I want to make sure we get the beginning of that clip.
>
> (Audio played.) Your Honor, that is where it starts.
>
> THE COURT: Is the government calling Ms. Mohn?
>
> MR. FORD: We are not, Your Honor.
>
> THE COURT: Is this your last witness?
>
> MR. FORD: He is, Your Honor.
>
> THE COURT: All right.
>
> MR. PELKER: Your Honor, may I add – before you rule on this matter, could I just add one more thing?
>
> THE COURT: Sure.

MR. PELKER: Your Honor, I just believe Mr. Geoffrey Ford, though he's a special agent, he's an inappropriate witness to introduce this. The appropriate person is Dauphin County's record custodian, as it is a Dauphin County record. I need to – we need to make sure that this is an authentic, accurate version of the recording, and Mr. Ford cannot provide that opinion.

THE COURT: Understood. Okay. Anything you want to add?

MR. FORD: Your Honor, Agent Ford has heard the defendant's voice over the course of the past two years through multiple hearings. He's very familiar with the defendant's voice. He can listen to that clip and know that it's the defendant making that statement. Additionally, Your Honor, if we were to bring it in through a records custodian, then it would be clear that it's a prison phone call.

THE COURT: Okay. Mr. Pelker, your concerns go to the weight of the evidence. And, of course, you're entitled to question the witness on the items that you raise. But the government has established an adequate foundation for admission because of the testimony of the agent that he knows your voice and Ms. Mohn's voice.

(Doc. No. 402 at 619:13-25, 621:1-7.)

After the jury was brought back into the courtroom, the recording was played before the

jury during the Government's direct examination of Special Agent Ford, during which the

following exchange occurred, in relevant part, as follows:

BY MR. FORD:

Q. Agent Ford, before we went on break, we were discussing the firearm that was used in the – by the defendant in the Gratz robbery, the second Schuylkill robbery. Correct?

A. Yes, sir.

Q. All right. And during the course of your investigation, were you able to listen to a recorded call between the defendant and Ms. Mohn?

A. Yes, I was.

Q. And I'd like to play for you Government Exhibit 58. (Audio played.) Pause it. Agent Ford, that first voice that we heard, whose voice was that?

A. Derek Pelker.

Q. And the second voice that we heard, who was that?

A. Lauren Mohn.

Q. We can go ahead and continue. (Audio played.)

(Doc. No. 402 at 622:9-24.)

### 1.     Applicable Legal Standard

Federal Rule of Evidence 901(b)(5) provides that "[a]n opinion identifying a person's voice – whether heard firsthand or through mechanical or electronic transmission or recording – based on hearing the voice at any time under circumstances that connect it with the alleged speaker" satisfies the Rule's general requirement that the proponent of a specific item of evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." See Fed. R. Evid. 901(a), (b)(5). "Voice identification may be established by lay opinion, by a person who has heard the voices of the speakers and is familiar with the voices." United States v. Ligambi, 891 F. Supp. 2d 709, 717-18 (E.D. Pa. 2012) (citing Fed. R. Evid. 901(b)(5), Gov't of Virgin Islands v. Martinez, 847 F.2d 125, 128-29 (3d Cir. 1988)). "Voice identification can also be established by self-identification of the speakers, circumstantial evidence, or both." Id. at 718 (citing United States v. Apler, 449 F.2d 1223, 1229 (3d Cir. 1971)). Courts have characterized "the [G]overnment's burden in identifying the speaker in recorded conversations" as "relatively minimal." See United States v. Stills, Crim. Action Nos. 04-680-03, 04-680-04, 04-680-05, 04-680-06, 04-680-07, 2006 WL 1737496, at *2 (E.D. Pa. June 22, 2006) (citing United States v. Bush, 405 F.3d 909, 919 (10th Cir. 2005); United States v. Plunk, 153 F.3d 1011, 1023 (9th Cir. 1998); United States v. Cerone, 830 F.2d 938, 949 (8th Cir. 1987)).

### 2.     Arguments of the Parties

Defendant asserts primarily that the recording of the phone conversation between Lauren Mohn and him should not have been admitted into evidence or played for the jury primarily because "the recording was never ruled as a true and accurate recording of the allege[d] original phone call[,]" and "Defendant never stipulated that the phone call was an accurate and authentic copy of the alleged original phone call." (Doc. No. 463 at 15-16.)[16] In opposition, the Government states that Defendant's argument that the audio recording was never deemed a true and accurate copy of the original call is meritless because "in order to authenticate a voice," Federal Rule of Evidence 901(b)(5) requires only that an opinion identifying an individual's voice, "whether heard firsthand or through mechanical or electronic transmission or recording," be "based on hearing the voice at any time under circumstances that connect it with the alleged speaker." (Doc. No. 468 at 22-23) (citing Fed. R. Evid. 901). The Government further states that, prior to the recording being admitted, Special Agent Ford "stated that he had interviewed Lauren Mohn on two separate occasions and listened to several calls that [] [D]efendant had made to her" and also explained that he previously heard Defendant's voice "during three days of trial." (Id. at 23.) According to the Government, under the applicable legal standard, the admission of the audio recording was proper.

### 3. Whether Defendant is Entitled to a New Trial Because of the Admission of Evidence Pertaining to Defendant's Phone Conversation from Prison

The Court finds that Defendant is not entitled a new trial on this ground because the recording of the phone call between Defendant and Lauren Mohn was properly admitted into

---

[16] To the extent that Defendant challenges the admission of the phone call on the basis that it prejudiced him by permitting an inference on the part of the jury that he was previously incarcerated (Doc. No. 463 at 15-16), the Court rejects such an argument for the same reasons explained supra as to Special Agent Ford's testimony.

evidence. The admission of the call recording satisfied Rule 901, as evidenced by Special Agent Ford's testimony that he had become familiar with Defendant's and Lauren Mohn's voices over the course of his investigation into this case (Doc. No. 402 at 616:11-24, 617:1-4), which was buttressed by Attorney Ford's statement to the Court outside the presence of the jury that "Agent Ford has heard the defendant's voice over the course of the past two years through multiple hearings. He's very familiar with the defendant's voice. He can listen to that clip and know that it's the defendant making that statement" (id. at 620:19-23). As the Court noted during this sidebar, Defendant's concerns regarding the admissibility of the recording "go to the weight of the evidence[,]" and "the [G]overnment has established an adequate foundation for admission because of the testimony of the agent that he knows [Defendant's] and Ms. Mohn's voice." (Id. at 621:2-7.) Because the admission of the phone call recording was proper, therefore, Defendant is not entitled to a new trial on this ground.

## IV. CONCLUSION

Based on the foregoing, the Court will deny Defendant's motion. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania